# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-2349

_____

|  |  |  |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | Appeal from the United States |
| | * | District Court for the |
| v. | * | Western District of Missouri. |
| | * | |
| Elias Mohamed, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: January 15, 2010
Filed: April 13, 2010

_____

Before GRUENDER and SHEPHERD, Circuit Judges, and LANGE[1], District Judge.

_____

LANGE, District Judge.

Elias Mohamed ("Mohamed") was convicted of conspiracy to commit mail fraud in connection with a scheme to obtain fraudulently Missouri commercial driver's licenses. Mohamed appeals the denial of his motion to suppress materials found in his possession during a traffic stop and challenges a verdict director instruction that included overt acts not specifically alleged in the indictment. For the reasons set forth below, we affirm.

_____

[1]The Honorable Roberto A. Lange, United States District Judge for the District of South Dakota, sitting by designation.

## I.  Factual Background

On May 25, 2005, at 3:04 a.m., Minnesota State Patrol Corporal Robert Frisby ("Trooper Frisby") stopped a car driven by Mohamed for not having an operating light illuminating his rear license plate.  During the initial interaction, Trooper Frisby asked Mohamed "what he was up to" and "where he was headed."  In response, Mohamed explained that he was driving a borrowed car and returning to Kansas City after attending a funeral in Minneapolis.  Mohamed told Trooper Frisby that the funeral had occurred earlier in the day, and after taking a nap, he had decided to return to Kansas City that night.  During the conversation, Trooper Frisby noticed that some of the door panels on the inside of the car were loose, that Mohamed seemed more nervous than would be considered normal, that his breathing was heavier and deeper, and that his nervousness "remained elevated or slightly increased the longer the stop went."

At 3:11 a.m., roughly seven minutes into the traffic stop, Trooper Frisby completed the warning ticket and told Mohamed he was "good to go." Trooper Frisby acknowledged in his testimony that the reason for the stop had been completed.  However, as Mohamed got out of the patrol car, Trooper Frisby asked whether Mohamed had any drugs, weapons, or money in the car.  Mohamed told him "no," but was unable to make eye contact and instead looked toward his car.  Trooper Frisby then asked Mohamed for consent to search the car. Mohamed said that he would prefer not to allow Trooper Frisby to search the car.  Trooper Frisby told Mohamed that he had reasonable suspicion to run a drug dog around the car.  Trooper Frisby testified that his reasonable suspicion arose from the loose panels in the car, Mohamed's explanation of his travel purpose, his level of nervousness, and his inability to sit still or maintain eye contact.

At 3:16 a.m., approximately five minutes after the stop had been completed, Trooper Frisby began walking the dog around the car.  The canine search was completed within thirty-five seconds.  The dog alerted to the car.  About twelve

minutes elapsed between the time Trooper Frisby initially stopped Mohammed's car at 3:04 a.m. and the time the dog made the positive identification. Following the dog's alert, Trooper Frisby concluded that he now had probable cause to search the car for controlled substances. Trooper Frisby found marijuana seeds inside the car and documents pertaining to Missouri commercial driver's licenses inside the trunk.

On September 20, 2006, Mohamed was charged with conspiracy to commit mail fraud. In the Overt Acts portion of Count 1 charging conspiracy to commit mail fraud, paragraph 35 alleged that Mohamed directed students to Ernest White ("White"), another alleged co-conspirator, knowing White would provide students with fraudulently obtained Missouri commercial driver's licenses by and through the use of the mail.

After he was indicted, Mohamed moved to suppress any evidence obtained from the May 25, 2005 search of his car, claiming that the search violated his rights under the Fourth Amendment. The Magistrate Judge[2] held a suppression hearing and, on October 23, 2007, entered a report and recommendation to deny the motion to suppress, concluding that the continued detention following the completion of the purpose of the stop was de minimis. On November 9, 2007, the district court[3] adopted the report and recommendation.

At trial, co-conspirator White testified that he helped individuals pass the Missouri commercial driver's license examination by providing students at South Central Career Center ("SCCC"), a third-party tester under contract with the State of

[2]The HONORABLE JAMES C. ENGLAND, Chief United States Magistrate Judge for the Western District of Missouri.

[3]The HONORABLE GARY A. FENNER, United States District Judge for the Western District of Missouri.

Missouri to administer the skills test, with answers to the written portion under the guise of translation services. White testified that in 2003 he met Osman Abdullahi ("Abdullahi"). Abdullahi operated a business named "Translation Station," where he provided translation services to students taking the written test. He informed White that he provided answers to the students together with translation services. White helped students pass the skills portion of the test by bribing one of SCCC's third-party testers, Orbin May ("May"), to assure the students passed the driving portion of the test.

White identified Mohamed as one of Abdullahi's business associates. White testified that Mohamed knew about the arrangement between White and May and that Mohamed continued to send students to White to help them pass the commercial driver's license skills test. White testified that Mohamed and Abdullahi referred between 80 and 120 students to White.

The government also provided testimony of Abdu Mohamed Osman ("Osman"). Osman testified that Mohamed sold him a Missouri commercial driver's license form D3R for $900. Osman identified the D3R found in the trunk of Mohamed's vehicle by Trooper Frisby as a document that he purchased from Mohamed to obtain a commercial driver's license. The D3R form which Osman purchased from Mohamed indicated that he had taken the skills test at SCCC and that the test was administered by May.

Ahmed Muhidin Sharif ("Sharif"), who received assistance in obtaining his Missouri commercial driver's license from Abdullahi, testified that he directed a student to Mohamed to obtain a commercial driver's license. Sharif stated that the student left with Mohamed and then returned two hours later with a completed commercial driver's license skills document showing that he had passed the skills test.

-4-

The government introduced records of Mohamed's cell phone use as evidence of the mail fraud conspiracy. The records showed that the cell phone number that Mohamed had provided to Trooper Frisby had been used in numerous telephone contacts with May, White, and Abdullahi during the time of the conspiracy. FBI Agent Clayton Bye interviewed Mohamed after his arrest and testified that Mohamed told him that he knew Abdullahi and White. Mohamed denied having translated for them or possessing any papers that would help a person fraudulently to obtain a commercial driver's license.

At trial, the district court gave a verdict director instruction, instruction 21. Paragraph 4 of jury instruction 21 stated that one element that the government must prove in order for the defendant to be found guilty is that:

> "[W]hile the agreement or understanding was in effect, a person or persons who had joined in the agreement knowingly did one or more of the following acts for the purpose of carrying out or carrying forward the agreement or understanding:
>
>     a. assisted in providing translation services which actually fraudulently provided the correct answers to the Missouri CDL written test in order to allow the student to then take the CDL driving test to obtain a Missouri CDL;
>
>     b. directed persons seeking to obtain CDL licenses to co-defendant Ernest White, knowing that White would obtain these CDL licenses in an illegal manner by fraudulent means through his relationship with co-defendant Orbin May;
>
>     c. with other persons sold outdated versions of the Missouri CDL driving exam forms without the person purchasing the form actually having taken the Missouri CDL driving test."

On January 7, 2009, a jury found Mohamed guilty of conspiracy to commit mail

fraud. He was sentenced on May 28, 2009, and filed a notice of appeal on June 7, 2009.

## II. Standard of Review

With regard to a district court's ruling on a motion to suppress, we review the findings of fact for clear error and the legal conclusions de novo. *United States v. Pena-Ponce*, 588 F.3d 579, 583 (8th Cir. 2009). We review the district court's jury instructions for an abuse of discretion. *United States v. Lewis*, 593 F.3d 765, 771 (8th Cir. 2010). In this review, we must analyze whether the instructions, taken as a whole, and viewed in light of the evidence and applicable law, fairly and accurately submitted the issues in the case to the jury. *United States v. Rehak*, 589 F.3d 965, 972 (8th Cir. 2009); *United States v. Beckman*, 222 F.3d 512, 520 (8th Cir. 2000).

## III. Discussion

A. Fourth Amendment Issues

Mohamed concedes that Trooper Frisby lawfully stopped his car based on probable cause. Failing to have his license plate illuminated is a traffic violation, albeit minor, and therefore establishes probable cause for initially stopping Mohamed. *See United States v. Beck*, 140 F.3d 1129, 1133 (8th Cir. 1998); Minn. Stat. § 168.12 (2009). A positive identification by a dog during a canine search following a lawful stop of a vehicle provides probable cause that drugs are present in the vehicle, thereby justifying a search of the vehicle. *See United States v. Bloomfield*, 40 F.3d 910, 919 (8th Cir. 1994) (en banc). Therefore, because the initial stop by Trooper Frisby and the ultimate search of the vehicle were both lawful, the evidence obtained from the search will be suppressed only if the continued detention of Mohamed, from the time the purpose of the stop was completed to the time of the canine search, was unreasonably extended. *See United States v. Rivera*, 570 F.3d 1009, 1013 (8th Cir.

2009) (where truck was stopped for speeding and following too closely, a dog's alert provided probable cause to search truck for drugs, and evidence was suppressed only if the defendant was unlawfully detained when the dog sniff of the car occurred).

Mohamed's motion to suppress sought to exclude evidence of Missouri commercial driver's license forms found in the trunk of his vehicle, arguing that the search violated his Fourth Amendment rights. Mohamed asserts that Trooper Frisby's continued detention and walking the dog around the vehicle after the purpose of the stop had been completed was primarily for interdicting illegal drugs or to advance the general interest in crime control. The Fourth Amendment requires individualized suspicion in order for a seizure to be considered reasonable. *Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000). Absent individualized suspicion, a seizure is unreasonable unless it serves a "special need." *Id.*

Although a *suspicionless* seizure of a motorist whose primary purpose was to detect evidence of ordinary criminal wrongdoing is not permissible under a "special needs" analysis, the seizure of Mohamed was not suspicionless. Because the seizure was not at a random checkpoint, but instead arose out of a lawful traffic stop, the general rule of balancing for reasonableness should be applied. Under *United States v. Alexander*, 448 F.3d 1014, 1016 (8th Cir. 2006); *United States v. Martin*, 411 F.3d 998, 1002 (8th Cir. 2005); and *United States v. $404,905.00*, 182 F.3d 643, 649 (8th Cir. 1999), when a dog sniff occurs after a very short lapse of time from when the purpose of the traffic stop has been completed, there is a de minimis intrusion, and therefore, under the general rule of reasonableness, the stop does not violate the Fourth Amendment.

In order to protect an individual's interest in liberty, the Fourth Amendment limits a detention or search conducted subsequent to a lawful traffic stop. *$404,905.00*, 182 F.3d at 648. A lawful traffic stop that is extended in order to execute a canine sniff does not become an unconstitutional seizure where the stop is

reasonably prolonged and constitutes only de minimis intrusions on a defendant's liberty. *Alexander*, 448 F.3d at 1016; *$404,905.00*, 182 F.3d at 649. For example, in *Alexander*, 448 F.3d at 1017, the canine sniff was a de minimis intrusion when it occurred four minutes after the completion of a lawful traffic stop. In *Martin*, 411 F.3d at 1002, a canine sniff that occurred two minutes after the conclusion of the traffic stop was considered a de minimis intrusion. *See also $404,905.00*, 182 F.3d at 649 (canine sniff completed two minutes subsequent to completion of traffic stop was a de minimis intrusion).

Trooper Frisby completed the canine search within five minutes of concluding a lawful stop. Trooper Frisby did not unreasonably extend the seizure of Mohamed by prolonging the seizure by five minutes to conduct a canine search. Although reasonable suspicion is not required for a canine search to be considered a de minimis intrusion on a driver's personal liberty, *see Alexander*, 448 F.3d at 1016; *Martin*, 411 F.3d at 1002; *$404,905.00*, 182 F.3d at 649, it is worth noting that such reasonable suspicion existed in this case. Trooper Frisby stopped Mohamed for a traffic violation and then noticed loose door panels inside the vehicle. Mohamed's explanation of why he was on the road and his demeanor aroused Trooper Frisby's suspicions. Trooper Frisby noted that Mohamed's breathing was heavier and deeper than is typical, that his level of nervousness remained elevated, and that he was unable to maintain eye contact during certain questions or stay in one position. Thus, the canine sniff did not unreasonably prolong the stop, and was based on reasonable suspicion anyway to believe that there might be drugs in Mohamed's car.

B. Jury Instruction Issue

Mohamed argues that because the verdict director instruction included overt acts which were not specifically alleged in the indictment, the district court erred and Mohamed's conviction should be remanded for a new trial. Mohamed also argues that jury instruction 21, the verdict director, which was derived from Eighth Circuit Model

Criminal Jury Instructions § 5.06A, violated due process of law because it did not require the jury to find that Mohamed personally committed the overt acts in furtherance of the conspiracy in order to convict him of conspiracy to commit mail fraud.

Count 1 of the indictment charged that Mohamed and fourteen other individuals conspired with one another to commit mail fraud. The indictment alleged that Mohamed committed the overt act of directing students to another co-conspirator, Ernest White, knowing that he would provide students with fraudulently obtained commercial driver's licenses. Although Mohamed argues that the jury instruction refers to overt acts not pled in the indictment, specifically that he was in possession and sold D3R documents found in his vehicle, a defendant may be found guilty of overt acts not charged in the indictment. *See United States v. Sdoulam*, 398 F.3d 981, 992 (8th Cir. 2005). A variance between the indictment and proof occurs "when the essential elements of the offense set forth in the indictment are left unaltered but the evidence offered at trial proves facts materially different from those alleged in the indictment." *See United States v. Begnaud*, 783 F.2d, 144, 147 n.4 (8th Cir. 1986). In *Sdoulam*, this Court stated that "the inclusion of some overt acts in an indictment does not bar proof of other acts, and proof of other acts in furtherance of the same conspiracy does not constitute a variance." 398 F.3d at 992. The elements of the offense for which Mohamed was charged did not change when other overt acts were proven at trial, and the additional acts contained in the verdict director were not materially different from the charge in the indictment. Mohamed recognizes that *Sdoulam* is on point, but urges the court to overrule *Sdoulam* on the principle that "a person ought not to be convicted of an overt act not charged in the Indictment." This Court refuses to overrule *Sdoulam*.

Even if the overt acts were a variance, Mohamed's conviction still was proper under the circumstances. The indictment fully and fairly apprised him of the charges against him, despite the alleged variance, and therefore there was no actual prejudice

to Mohamed. *See Begnaud*, 783 F.2d at 148 (defendant suffers no actual prejudice so long as an indictment fully and fairly apprises the defendant of the charges he must meet). The indictment charged Mohamed with conspiracy to commit mail fraud by assisting students to the conspiracy with obtaining licenses fraudulently. Mohamed was fully and fairly apprised of the charges that were brought against him and was able to prepare a defense to the conspiracy charge.

The district court instructed the jury that in order to prove mail or wire fraud conspiracy, the government needed to prove that "while the agreement or understanding was in effect, a person or persons who had joined the conspiracy did one or more of the following acts." Under the federal conspiracy statute, a conspiracy is committed when two or more persons conspire to commit any offense against the laws of the United States, and only requires that one or more of the co-conspirators commit an overt act to further the purposes of the conspiracy. *See* 18 U.S.C. § 371 (2009). The requisite overt act is satisfied by a single overt act committed by one co-conspirator. *United States v. Falcone*, 311 U.S. 205, 210 (1940). Although Mohamed argues that such a jury instruction allows for him to be found guilty without him ever committing an overt act, the government is not required to prove that he committed an overt act. The government need show that "only one of the conspirators engaged in one overt act in furtherance of the conspiracy" and that Mohamed was part of the conspiracy. *United States v. Hermes*, 847 F.2d 493, 495 (8th Cir. 1988); *see also United States v. Hobson*, 686 F.2d 628, 630 (8th Cir. 1982); *United States v. Bass*, 472 F.2d 207, 213 (8th Cir. 1973). Because the government proved that Mohamed knowingly joined the conspiracy, the overt act need not be shown to have been committed by him.

Accordingly, we affirm.

_____